**SO ORDERED.**

**SIGNED this 31 day of March, 2008.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILSON DIVISION

IN RE:

**MELINDA S. JERNIGAN,**

      DEBTOR.                                      CASE NO. 07-04037-8-JRL
                                                        Chapter 13

_____

**ORDER**

This case is before the court on the debtor's motion for confirmation of Chapter 13 plan and the objection of Wells Fargo Auto Finance Inc. (Wells Fargo) to the proposed plan. On March 13, 2008, the court conducted a hearing on this matter in Wilson, North Carolina.

**BACKGROUND**

On August 16, 2006, the debtor purchased a 2005 Chevrolet Trailblazer pursuant to the terms of an installment sales contract with Chevrolet Cadillac of Goldsboro, Inc., which was subsequently assigned to Wells Fargo. Wells Fargo has a senior perfected first lien on the vehicle. On October 26, 2007, the debtor filed for relief under Chapter 13 of the Bankruptcy Code. The filing was within 910 days of the debtor's purchase the vehicle, which was acquired for the personal use of the debtor. Wells Fargo filed a proof of claim in the amount of $26,251.29. The debtor's proposed Chapter 13

plan attempts to cramdown Wells Fargo's claim and bifurcates the claim by treating $19,525.00 as a secured claim and $6,726.39 as an unsecured claim, to be paid over the life of the plan at 9.75 percent interest. On January 9, 2008, Wells Fargo filed an objection to the proposed plan, arguing that the debtor should not be permitted to cramdown Wells Fargo's claim pursuant to 11 U.S.C. § 1325, but that the debtor must pay Wells Fargo's claim in full for the remaining balance due under the contract.

## **ANALYSIS**

Section 506 of the Bankruptcy Code provides that claims of creditors are treated as secured to the extent of the value of the property and as unsecured to the extent that the value is less than the amount of the allowed claim. 11 U.S.C. § 506(a). However, the "hanging paragraph" of Section 1325 provides that Section 506 shall not apply to a claim "if the creditor had a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for personal use of the debtor[.]" Id. § 1325. Under the "dual status rule," adopted by the Eastern District of North Carolina in In re Price, a creditor's security interest may be "a purchase money security interest to some extent and a non-purchase money security interest to some extent." In re Price, No. 5:07-CV-133-BR (E.D.N.C. Nov. 14, 2007). Therefore, the non-purchase money portion of the claim is treated as unsecured, while the purchase money portion is treated as secured. In re Conyers, 2007 WL 3244106 at *6 (Bankr. M.D.N.C. Nov. 2, 2007). Courts have differed on what charges may be included as part of the purchase price of the vehicle. The North Carolina General Statutes define purchase money obligation as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the

debtor to acquire rights in or the use of the collateral if the value is in fact so used." N.C. Gen. Stat. § 25-9-103. In general, routine transactional costs are considered part of the purchase price of the collateral as defined under the North Carolina General Statutes and are thus part of the purchase money obligation. In re Sherwood, 07-02809-8-JRL (Bankr. E.D.N.C. Jan. 29, 2008) (citing N.C. Gen. Stat. § 25-9-103 (official cmt. 3)). However, courts have differed on the inclusion of various expenses, such as negative equity,[1] gap insurance, and warranty and service contracts as part of the purchase money security interest. The Bankruptcy Court for the Eastern District of North Carolina has held that neither negative equity nor gap insurance are included as part of the purchase price of the collateral. See In re Price, 363 B.R. 734 (Bankr. E.D.N.C. 2007), *rev'd* in part and *aff'd* in part by In re Price, No. 5:07-CV-133-BR.

In the instant case, the debtor has financed $4,213.05 in negative equity, $495.00 in gap insurance, and $1,695.00 for an extended service contract, along with the $21,514.70 purchase price of the vehicle and various other taxes and fees. The total amount financed is $28,361.25. Because neither negative equity nor gap insurance are included as part of the purchase money security interest under Price, these amounts must be subtracted from the total amount financed in order to determine the purchase money secured claim. However, the issue remains as to whether the amount paid for the service contract is included as part of the purchase money price of the vehicle. Although the Eastern District of North Carolina has not specifically addressed this issue, numerous bankruptcy courts have held that payments for extended service contracts are included as part of the purchase money security interest. See In re Macon, 376 B.R. 778, 782 (Bankr. D. S.C. 2007); In re Pajot, 371

---

[1]Negative equity is created when a buyer owes more on a traded-in vehicle than he receives from the trade-in allowance.

B.R. 139, 155 (Bankr. E.D. Va, 2007); In re Murray, 346 B.R. 237, 240 (Bankr. M.D. Ga. 2006). This court is in agreement with the cases holding that extended service contracts are included as part of the purchase money security interest because such charges are so tied to the value of the collateral that they fall within the meaning of purchase money obligation under the North Carolina General Statutes. Therefore, the $1,695.00 paid by the debtor for an extended service contract is included as part of the purchase money security interest, making the total purchase money portion of the amount financed $26,251.29.

The final determination before the court is the allocation of pre-petition payments made by the debtor to the purchase money and non-purchase money portions of the claim. In Price, the District Court stated that "the most appropriate and realistic default method of allocating payments under the dual status rule is to allocate them proportionately, according to the ratio of the non-purchase money portion of the total amount financed." In re Price, No. 5:07-CV-133-BR (E.D.N.C. Nov. 14, 2007). Here, of the $28,361.25 that the debtor financed, the purchase money portion is $26,251.29. Therefore, the ratio to be used in allocating pre-petition payments is as follows: 16.6% of pre-petition payments should be applied to reduce the unsecured portion of Wells Fargo's claim and 83.4% of the pre-petition payments should be applied to reduce the secured portion of the claim. This court followed this analysis of determining the secured claim of a creditor in In re Sherwood. However, in Sherwood, the court was not provided sufficient information to calculate the secured claim, and therefore directed the trustee to use the ratios provided by the court to allocate pre-petition payments to the purchase money and non-purchase money portions of the creditor's claim. To the extent Sherwood required the trustee look at the debtor's payment history and examine how each pre-petition payment was actually credited, the court deems such an exercise unnecessary based

on the evidence presented here. At the hearing, Wells Fargo presented evidence of two methods of calculating the secured claim under the dual status rule. First, Wells Fargo calculated the secured claim by applying the above listed percentages to the total debt owed to Wells Fargo on the day the debtor filed the bankruptcy petition. This method of calculation assumes that each pre-petition payment is allocated proportionately to every category of charge included in the total amount financed. Second, Wells Fargo calculated the secured claim by analyzing the debtor's payment history and splitting each payment between the purchase money and non-purchase money portions of the claim. The court is pleased to see that an almost identical result is reached using each of these two calculation methods. The court therefore adopts the vastly simpler method for determining the amount of the secured claim that assumes that the pre-petition payments were allocated according to the percentage of purchase money and non-purchase money that make up the debt. Thus, the value of the secured claim may be determined by simply multiplying the amount of the claim at the time of filing by the percentage of the debt that is the purchase money obligation. Using that method of computation here, the secured claim of Wells Fargo is valued at $21,893.58.

## **CONCLUSION**

Based on the foregoing, the objection of Wells Fargo is sustained and Wells Fargo's secured claim is valued at $21,893.58. The court finds that the amount paid for the extended service contract is so tied to the value of the vehicle that it falls within the definition of purchase money obligation under the North Carolina General Statutes.

"**END OF DOCUMENT**"